SMITH *v*. F & C ENGINEERING Co.

5-795                                    285 S. W. 2d 100

Opinion delivered December 12, 1955.

[Rehearing denied January 16, 1956.]

*Tom Gentry* and *John K. Shamburger,* for appellant.

*Mehaffy, Smith & Williams,* for appellee.

MINOR W. MILLWEE, Associate Justice.   This appeal is from a decree making permanent a temporary injunction against picketing, the making of threats and the commission of acts of intimidation and violence in connection with a labor dispute.

Appellee, F & C Engineering Co., hereinafter called "plaintiff," was one of approximately twenty-five prime contractors engaged in construction of the Little Rock Air Force Base, near Jacksonville, Arkansas, by the U. S. Army Engineers in the early part of 1955. Appellants, hereinafter called "defendants," include J. W. Smith, Assistant Business Agent of International Union of Operating Engineers, Local 382, and certain employees of plaintiff who were sued individually and as representatives of said union. Some of the defendants were members of the union and some were not.

As an officer of Local 382, defendant, J. W. Smith, sought to negotiate with plaintiff relative to overtime pay to its employees for hours worked in excess of 40 hours per week and for certain union recognition in the organization and hiring of operating engineers under plaintiff's two contracts with the Army Engineers. Plaintiff paid its employees overtime for hours in excess of eight per day, but it was one of very few contractors on the project who refused to pay overtime for hours in excess of 40 hours per week. As a result of plaintiff's refusal to deal with the union in these matters, Smith and other union representatives established a picket line at plaintiff's batch plant which is located just outside the air base proper on March 3, 1955. This plant is the storage and dispensing area for all concrete materials used by plaintiff, and about 135 men were normally employed there.

On March 7, 1955, plaintiff filed the instant suit for injunction. Based upon testimony then presented, the Chancellor issued a temporary order restraining defendants, their agents, employees and members from picketing plaintiff and its places of business and from threatening or committing acts of intimidation or violence against plaintiff's business, property, agents, employees and persons seeking to do business with plaintiff. After a full hearing on April 1, 1955, the case was taken under advisement and on April 22, 1955, a decree was entered making the temporary injunction permanent. Defend-

ants' subsequent motion to modify the decree was overruled on April 27, 1955.

As a basis for the decree, the Chancellor also filed an exhaustive and well considered opinion in which he made findings of fact as follows:

"1.   On Thursday morning, March 3, 1955, a picket line was established at the site of a batch plant operated by the plaintiff located a short distance outside of the Little Rock Air Force Base limits, and the picket line was maintained from that time until after the issuance of the Court's temporary restraining order on Monday, March 7, 1955.   The entrance and exit roads to and from the batch plant are narrow, unpaved roads, and although only four men were actually engaged in the carrying of picket signs, the total number of men in the immediate locality varied from twelve or fifteen to fifty or sixty. The signs contained language to the effect that the plaintiff was unfair to and destroying certain working standards of the Operating Engineers' Union.   In addition to the men, there were a great number of cars parked up and down the road running by the batch plant.   The large number of men was in no wise necessary to disseminate information or inform the public of the nature of the dispute, and the presence thereof served only to add emphasis to the threats and other acts which will be hereinafter set forth and the presence of these men undoubtedly had an adverse influence upon the employees who continued to work.   On one occasion one of the roads was blocked by a pickup truck.   Mr. Ray Spillers, superintendent of the plaintiff, requested of the men present at the picket line that the owner of the truck move it since it was blocking the road.   Mr. Spillers was informed by one of the men in a belligerent manner that the truck would not be moved and that if Mr. Spillers didn't like it he could get out of his vehicle.   Mr. Spillers left to avoid an incident and the truck was thereafter moved.   This incident occurred on Friday morning, March 4, 1955.   In this regard, Mr. Spillers gave instructions to all of the employ-

ees of the plaintiff to avoid any kind of an incident with the strikers and men on the picket line.

"2. On Thursday, March 3, 1955, Brady Lawhorn was stopped on one of the batch plant roads by the defendant, Wayne Sowell, and informed in a belligerent manner and with the use of curse words that Lawhorn had better not cross the picket line the following morning or he (Lawhorn) would be whipped. During the remainder of the time that the picket line was maintained, Mr. Lawhorn walked a considerable distance out of his way in order to avoid crossing the picket line, and according to his testimony in order to avoid the likelihood of being whipped. Sowell admitted that he did stop Lawhorn, but that the controversy was over a lunch which Sowell alleges that Lawhorn had taken sometime previously and had not paid for. The Court is not impressed with this explanation, which was emphatically denied by Lawhorn, in view of the fact that Lawhorn was stopped at the picket line and, the Court believes, was threatened. This conclusion is reached by the Court in view of the other incidents that occurred and this appears to have been but one of several acts in the defendants' course of conduct to achieve their objectives by intimidation and coercion.

"3. On Thursday, March 3, 1955, L. C. Rackley, at that time a crane operator for the plaintiff, was accompanied through the picket line by Warren Dixon, truck foreman for the plaintiff, and other men, and they were cursed as the vehicle moved into the batch plant site. The evidence is clear that Rackley had been frightened prior to that time and quit immediately after this occurrence. A former employee of the plaintiff, Otis Nickolas, testified for the defendants that he accompanied Rackley and Dixon and that he heard no statements made. Nickolas was subsequently discharged by the plaintiff, and although he did not take sides with the defendants until after his discharge he did appear in court to testify on their behalf. There is no dispute in the evidence that something frightened Rackley and that he quit after this

incident, and the Court is convinced that Rackley left the employ of the plaintiff because he feared for his own safety.

"4. On Friday afternoon, March 4, 1955, the defendant, W. E. Clements, and another man told plaintiff's employees, Oliver Beck and A. M. Foster, that somebody was going to get 'their head skint.'

"5. On Friday night, March 4, 1955, Frank Rogers, General Foreman of the plaintiff, was attacked without notice or provocation in Rixie's Cafe located on the highway near Jacksonville, and a blackjack was used in this attack. The persons making the attack were identified by nicknames only, one called 'Talley' and one called 'Alabam.' 'Alabam' was positively identified as a joint machine operator working for Tecon Corporation on the Little Rock Air Force Base and the proof shows that Tecon was working under a contract with the defendant Union and was running a union shop. There was no provocation on the part of Rogers or any other employee of the plaintiff in connection with this attack and the evidence disclosed no reasons for the attack other than those connected with the dispute involved herein. On the next day, Saturday, March 5, 1955, the defendant Clements and another person talked to plaintiff's employee, Henry Garrett, and other employees, urging them to join those picketing the plaintiff, and during the conversation pointed out in substance to the plaintiff's employees that they (the employees) 'had seen what happened to Frank Rogers the night before.' In view of the previous threat that someone was going to get his 'head skint'; the absence of anything to indicate a reason for anyone other than the defendants or those working on behalf of the objectives of the defendants having responsibility for the beating; the administering of the beating by a Tecon employee performing an operating engineer's job for Tecon, which was running a union shop and which had a contract with the defendant union; the fact that the defendant, J. W. Smith, was in the cafe a very few minutes after the beating; and the fact that the following day

the defendant Clements, admittedly a union member, pointed out to other employees of the plaintiff that they had seen what happened to Frank Rogers the night before, the Court can draw but one inference: Person or persons administering the beating were seeking to accomplish the objectives of the Union by acts of the same unlawful and coercive nature engaged in by other defendants, and, for purposes of responsibility, the defendants are chargeable with these acts. Clearly the same unlawful purpose was pursued and the connection is obvious. The concert of action cannot possibly be explained by sheer coincidence and the inference of a conspiracy must be and is drawn by the Court. In addition, after the beating of Frank Rogers, the plaintiff's employees found a pickup truck belonging to the plaintiff which had been driven by Rogers to the Cafe had been tampered with and damaged so that it had to be hauled away and repaired before it could be placed in operation.

"6. The evidence reflects a series of contacts with employees made by Union men which might be explainable from the standpoint of persuasion if considered as isolated incidents, but when considered in the light of the other acts of intimidation and violence are explainable only as a deliberate course of intimidation. On Friday, March 4, 1955, plaintiff's employees, Norman Lewis and Henry Garrett, were stopped by the defendant, W. E. Clements, and another person in a belligerent manner and Garrett and Lewis left in order to avoid an incident. Defendant Clements with another person came by the home of Henry Garrett looking for the latter and the defendant, M. L. Patterson, came to the home of employee, R. E. Shaver. On Thursday night, March 3, 1955, employee, W. H. Alexander, was followed from the batch plant by the defendant, J. W. Smith, both in automobiles, to the North Little Rock Police Station, at which time Alexander stopped and obtained a police escort to his home. The defendant Smith testified that he simply wanted to talk to Alexander, but admitted that he followed him, and the intimidating effect of Smith's action was the same regardless of the explanation offered. On

Saturday, March 5, 1955, one of the men present at the site of the picketing attempted to stop W. H. Alexander as the latter was driving into the batch plant, and when Alexander did not stop this man hit the automobile with a rock, the approximate size of a man's fist.

"On one occasion certain employees were stopped by the defendant, Bull, and other persons, and the person who stopped the vehicle was waving a club at the time and had been drinking. During the conversation the men in the car were advised that R. E. Shaver was the man that they wanted to get and Mr. Shaver testified that he had been materially assisting the plaintiff in obtaining replacements.

"7. The plaintiff was plagued with numerous flats on its batch trucks during the period involved and the evidence reflected that this had not been the situation prior to this time nor has it been the situation since. The plaintiff was forced to police the batch plant entrance and exit roads each morning and pick up nails, and a comparison between the numerous nails found on the entrance and exit roads to the batch plant and those in the tires causing the flats revealed that they were identical. The defendants denied that they had placed any nails in the road. The Business Agent for the Laborers' Union, who maintained a picket for some two days after Monday, March 7, 1955, testified that his Union did not place any nails in the road and that if they were placed there it was done by someone else. The facts are clear that the flats did occur and since the nails found in the tires and those on the roads were identical, the only inference that the Court can draw is that they were placed there by the only persons having a reason to place them there, the defendants.

"8. On one occasion a paving machine was found drained of oil and water and otherwise damaged and would have been substantially damaged had it been placed in operation.

"The defendants had several witnesses who gave negative testimony as to acts of violence and intimidation, several of whom were law enforcement officers. The officers testified that they were there pursuant to a request made and the Court recognizes that it would be contrary to human nature for the defendants to participate in any of the acts disclosed by the evidence while the officers were present."

In questioning the validity of the injunction, defendants argue that the Chancellor erred in permitting plaintiff's general superintendent and others to testify regarding numerous flat tires and the finding of several pounds of roofing nails scattered on the batch plant road and in permitting the pleadings to be amended to conform to such proof. Plaintiff had alleged there were "numerous instances of rock throwing and damage to plaintiff's property," which would be placed in evidence, but there was no specific allegation in reference to tire damage. Although defendants objected to the court's action in permitting the pleadings to be amended to conform to the proof on this issue, there was no plea of surprise nor request for a continuance. The amendment did not involve a new cause of action and defendants introduced testimony to rebut that offered by plaintiff on the issue. In similar circumstances, we have repeatedly held that it is within the discretion of the trial court to permit the pleadings to be amended to conform to the proof. *Duff* v. *Ayers*, 156 Ark. 17, 246 S. W. 508; *Mo. Pac. Transportation Co.* v. *Williams*, 194 Ark. 852, 109 S. W. 2d 924. There was no abuse of such discretion here.

Defendants also contend the court erred in allowing plaintiff's superintendent to give certain testimony in violation of the hearsay rule. Defendants' abstract of the record shows that the Chancellor sustained objections to most of the testimony now challenged. When asked whether he had difficulty retaining men on the job, the superintendent answered in the affirmative and stated that he had numerous calls at home at nights because men were afraid to come back on the job. The witness

was neither asked nor did he attempt to state what any individual told him. We think the trial court correctly held the testimony admissible to show the effect of the threats and other acts of intimidation proved. One of the well recognized exceptions to the hearsay rule is that relative to the admission of statements or declarations showing a presently existing state of mind, feeling or attitude such as fear or ill will in the declarant. McCormick on Evidence, § 268; Wigmore on Evidence (3rd ed.), § 1730. A pertinent and relevant issue here was whether the conduct, threats and acts of the defendants were actually intimidating, and we find no prejudicial error in the court's action in admitting this evidence. We have examined other objections made by defendants to the court's rulings on the admission of certain testimony and find them to be without merit. Even if error was committed in the admission of the evidence objected to by defendants, we are still of the opinion that a preponderance of the testimony supports the findings of the Chancellor on this trial *de novo*. *Turner* v. *Smith*, 217 Ark. 441, 231 S. W. 2d 110.

The principal contention for reversal is that the evidence here reveals a state of facts involving incidents so isolated, disconnected and disassociated as not to warrant the issuance of a permanent injunction. Pursuant to this contention, defendants make objections to certain of the trial court's findings of fact which have already been set out. Typical of these is the assertion that the court found that the pick-up truck blocked one of the roads to the batch plant in Finding No. 1 when, in fact, the truck only "partially" blocked said road. Other objections involve primarily the action of the court in accepting as credible the testimony of plaintiff's witnesses on certain issues when such evidence was to some extent contradicted by witnesses for the defendants. It would unduly prolong this opinion to set out these various conflicts in the evidence. It is sufficient to say that the Chancellor was in a more favorable position than this court to judge credibility, and after careful considera-

tion of all the evidence we think a clear preponderance thereof supports the court's findings of fact.

It is. well settled by the decisions of the U. S. Supreme Court and our own cases that peaceful picketing is allowed under the constitutional guaranty of freedom of speech in order that a union may acquaint the public with the fact and nature of a labor dispute and solicit public support in any lawful manner to prevail in the controversy. *Thornhill* v. *Alabama,* 310 U. S. 88, 60 S. Ct. 736, 84 L. Ed. 1093; *Local Union No. 313* v. *Stathakis,* 135 Ark. 86, 205 S. W. 450, 6 A. L. R. 894. It is equally settled that the law does not countenance the use of threats, intimidation, force, coercion, violence or other unlawful means, however laudable the motive or purpose of the strikers. *Riggs* v. *Tucker Duck & Rubber Company,* 196 Ark. 571, 119 S. W. 2d 507; 31 Am. Jur., Labor, § 240. In this connection the U. S. Supreme Court has held that the state still may exercise "its historic powers over such traditionally local matters as public safety and order and the use of streets and highways." *Allen-Bradley Local, W.E.R.M.W.* v. *Wisconsin Employment Relations Board,* 315 U. S. 740, 62 S. Ct. 820, 86 L. Ed. 1154.

Although the object of a strike may be both lawful and laudable, judicial restraint is permissible where the strike is attended with real or threatened violence, force, intimidation or conduct otherwise unlawful or oppressive, such as mass picketing or even peaceful picketing where enmeshed with violent conduct. Thus peaceful picketing may be enjoined without violating the right of free speech where previous unisolated acts of violence by members of the picketing union or their sympathizers give to continued picketing, even though peacefully carried on, a coercive effect. See *Milk Wagon Drivers Union* v. *Meadowmoor Dairies,* 312 U. S. 287, 61 S. Ct. 552, 85 L. Ed. 836, 132 A. L. R. 1200, where the court held that picketing which in itself is peaceful may be coercive when set in a background of violence. The court said that "utterance in a context. of violence can lose its significance as an appeal to reason and become part of an

instrument of force. Such utterance was not meant to be sheltered by the Constitution.''

In *Local Union No. 858 Hotel and Restaurant Employees Int'l Alliance* v. *Jiannas*, 211 Ark. 352, 200 S. W. 2d 763, we held that acts of violence and coercion were committed with such systematic persistence as to warrant a finding that they would be continued unless restrained where pickets walked very close to the door and on several occasions had to be pushed aside by customers to gain entrance to the restaurant being picketed, and on one occasion a customer was knocked down with a pair of brass knucks and severely injured. In that case the following statement from 31 Am. Jur., Labor, § 240, supra, was approved:

''Force threatened is the equivalent of force exercised. In many cases, it has been observed, it is difficult to draw the line of demarcation between intimidation and inoffensive persuasion. But even when the acts of the strikers, although unaccompanied by violence or threats, are such annoyance to others as to amount to coercion or intimidation they are unlawful.''

Perhaps the rationale of the result reached in the *Meadowmoor Dairies* and *Jiannas* cases, supra, is best stated by the annotator in 132 A. L. R. 1221 as follows:

''The reason most frequently advanced by the courts in justification of the blanket injunction against all picketing, where there has been past violence or other unlawful conduct, is that an injunction of such breadth is necessary to prevent future excesses and coercion, which, in the light of the past conduct, may reasonably be anticipated.''

Numerous cases are cited in support of the statement.

It is true that the threats and acts of intimidation and violence in the case at bar are not as great as those involved in the *Meadowmoor* and *Riggs* cases, supra, but they are greater in degree than those involved in the *Stathakis* and *Jiannas* cases, supra, and the cases of *Cafeteria Employees Union* v. *Angelos*, 320 U. S. 293, 64

S. Ct. 126, 88 L. Ed. 58, and *Local No. 802* v. *Asimos*, 216 Ark. 694, 227 S. W. 2d 154, upon which defendants rely. The Chancellor found that the threats and acts of intimidation, violence and property damage reflected by the proof here were not isolated and disassociated incidents, but were enmeshed in, and inseparably connected with, the picketing. A preponderance of the evidence supports this conclusion.

As to defendants' contention that the trial court erred in refusing to modify the injunction to permit peaceful picketing, what we said in the recent case of *Self* v. *Taylor*, 217 Ark. 953, 964, 235 S. W. 2d 45, is applicable here:

"One final point must be mentioned. Appellants argue that the court went too far in making the injunction 'Permanent.' In answer to a similar contention in *Milk Wagon Drivers Union* v. *Meadowmoor Co.*, 312 U. S. 287, 61 S. Ct. 552, 85 L. Ed. 836, the U. S. Supreme Court said: (at p. 298) 'The injunction which we sustain is 'permanent' only for the temporary period for which it may last. . . . Familiar equity procedure assures opportunity for modifying or vacating an injunction when its continuance is no longer warranted.' The injunction does not prevent appellants from bargaining in good faith for a legal contract. If legitimate differences arise not connected with the closed shop demand, which would warrant peaceful picketing, they may apply to the Chancery Court for appropriate modification of the injunction. If such modification is erroneously denied, an appeal always lies to this court."

If and when defendants are able to show the trial court that peaceful picketing can be carried on by the union in such manner as to avoid the likelihood of a repetition of the unlawfulness disclosed in this record, they are free to do so. Such showing had not been made at the time defendants sought a modification of the instant injunction.

Affirmed.

McFADDIN, J., not participating.