LOCAL UNION No. 858 OF THE HOTEL AND RESTAURANT
EMPLOYEES INTERNATIONAL ALLIANCE *v.* JIANNAS.

4-8123                                              200 S. W. 2d 763

Opinion delivered March 24, 1947.

Rehearing denied April 21, 1947.

*Rainberger & Eilbott, Joseph A. Padway* and *Herbert S. Thatcher,* for appellant.

*Bridges, Bridges, Young & Gregory* and *Rowell, Rowell & Dickey,* for appellee.

SMITH, J. Appellees who operate a restaurant in the business section of the city of Pine Bluff, brought this suit against the officers of Hotel and Restaurant Workers Union No. 858, and certain members of the Union who were, or had been, employees, to enjoin the alleged illegal picketing of their place of business. A temporary restraining order was granted, and a motion was filed praying that this order be dissolved, it being denied in the motion that defendants were picketing in an unlawful manner. The court granted the relief prayed by the appellees and refused to modify the restraining order, and from that decree is this appeal.

Appellees, plaintiffs below, offered the testimony of twenty-one witnesses, these being the two owners of the restaurant, eight employees and eleven members of the general public, the latter apparently had no personal interest in the litigation. The testimony on behalf of appellants was to the effect that they had employed no force or violence or coercion.

A number, less than a majority, of the plaintiffs' employees, were on strike, and to promote their demands for the enforcement of which they were striking, they began picketing plaintiffs' place of business which was a building fronting twenty-five feet on the principal street of the city, which had only one entrance from the street, a door five feet wide. Only two members of the Union were on picket duty at any one time, and these carried banners announcing that the place they were picketing was unfair to union labor. These pickets walked back and forth in front of the restaurant. They frequently walked within a few feet of the door, and in some in-

stances patrons desiring to enter had to push the pickets aside to do so. A crowd usually stood milling around the front of the building varying from ten to thirty in number.

One Wilson testified that on three occasions he was stopped by the pickets and their sympathizers from going into the building and was told not to do so, but he pushed by them and went in. On one occasion as he left the dining room a large man who was identified as one of the persons who hung around the door, asked him why he had gone into the building. He told the man it was none of his business, whereupon he was knocked down with a pair of brass knucks and severely injured. A number of witnesses testified that they and others were stopped by persons who congregated in front of the door, and were urged not to enter and there is abundant testimony that the pickets and their sympathizers did congregate near the door and did urge people who were about to enter, not to do so, and they thus deterred many people from entering. Plaintiffs testified that during the progress of the strike their business declined about ninety per cent.

Another witness testified that as a lady and her escort, who was carrying a baby, attempted to enter, the entrance was blocked and that witness did not attempt to enter as he did not want to have any trouble. Another witness testified that as he left the building a hand was placed on his shoulder, and he was asked why he had gone into the building, and when he answered that was his business, he was told not to get too smart or he might get hurt. This witness testified that he saw many others stopped as they attempted to enter. A lady testified that as she attempted to enter with her brother, one Landreth, to whom reference will be made shortly, remarked, "There go some sons of bitches now," and another man remarked, "Nobody but whores would go into that cafe." The court might well have found that such remarks were calculated to cause breaches of the peace, although they did not cause them in this instance. Only a bold man, or possibly a foolish one, would have been willing to antag-

onize the crowd then present, and when the witness was asked if the statement was resented, replied, "Certainly, but you would not want trouble with that bunch."

Another witness testified that she heard a picket call a man a son of a bitch. It was shown that one Jack Johnson, who while not a member of the Union on strike, was a sympathizer and was rather regular in his attendance on the picketing, and that he opened the door and shook his fist at employees who were working and had not gone on a strike and said, "I'll get you for it." Witness did not say what Johnson meant by the remark, but it would be difficult to misinterpret it. Another witness testified that persons who braved the remonstrances and entered were told they would be sorry for having done so.

The proprietor testified that the crowds, always large, grew larger on Saturday night, and that he was scared and closed his place of business and went home at 7 p. m. It was testified that a picket, a young woman, was intoxicated and that she brushed people with the banner she carried as she paraded in front of plaintiffs' place of business.

A waitress who did not join the strike, testified that she could see from within what happened without, and that the crowd in front of the cafe interfered with people who wanted to come in, and that the crowd stopped a number of people who otherwise would have come in; that the pickets walked up and down in front of the door, from one side of the door to the other, and that they walked in front of the door most of the time, and that it was hardly possible for people to enter the door without bumping into the pickets, and that she heard the pickets tell people "You don't want to go in there"; that some of the people actually had their hands on the door when someone would yell, "Hey, you don't want to go in there," and that most of these people left without entering.

One C. E. Landreth to whom reference has already been made, appears to have been in charge of the strike.

He testified that he was an organizer for the Union, and admitted that he sat in his automobile near the restaurant during much of the day, and that after 6 p. m. he parked his car in front of the restaurant. It was he who referred to the ladies about to enter the restaurant as whores.

A number of the persons who congregated in front of plaintiffs' restaurant were not members of the Union, probably most of them were not, but they were present aiding and abetting the strikers, and if their participation resulted in unlawful acts each through their concerted action was responsible for the acts of all the others done in the accomplishment of a common purpose. In the case of *Guerin* v. *State,* 209 Ark. 1082, 193 S. W. 2d 997, we quoted the following statement from the case of *Butt* v. *State,* 81 Ark. 173, 98 S. W. 723, 118 Am. St. Rep. 42, that ''when a conspiracy has been shown, then the acts and declarations of one conspirator in the furtherance of the common design may be shown as evidence against his associates.''

To attempt a review of the innumerable cases, both state and federal, which have discussed the right to employ picketing in aid of a strike in progress, and the limitations on that right, would be an interminable task, and to do so would be a work of supererogation so far as this case is concerned as our own cases on the subject have announced the principles which control the decision of the questions here presented. In one of these, that of *Local Union No. 313* v. *Statkakis,* 135 Ark. 86, 205 S. W. 450, 6 A. L. R. 894, we said: ''It is recognized, and this court has expressly decided, that the laborers have the right to organize into unions for the purpose of bargaining collectively for the betterment of their condition and, as an incident thereto, to strike collectively. *Meier* v. *Speer,* 96 Ark. 618, 132 S. W. 988, 32 L. R. A., N. S. 792. They have the right to say for whom and upon what terms they will work, and may act through their unions in the decision of these questions, provided, of course, no contracts of employment are broken. And when they fail, acting thus collectively, to agree with any employer and

have gone upon a strike, they have the right to apprise the public of that fact and to solicit the support, not only of members of the union, but of the public generally in any legitimate attempt to prevail in their controversy. Against the law as thus stated there appears to be no dissent. On the other hand, it is equally as well settled and as uniformly held by the courts that the labor unions have no right to resort to force, intimidation or coercion. Publicity as well as other means of persuasion may be used; but force, coercion and intimidation may not be used.''

This case was referred to in the brief of counsel for certain employees on strike in the later case of *Riggs* v. *Tucker Duck & Rubber Co.,* 196 Ark. 571, 119 S. W. 2d 507, as ancient law now obsolete, but we adhered to our former holding and the opinion of the majority has not changed.

The effect of these cases and an innumerable number of others is that the employee may strike when and if he pleases, and he has the right to solicit support in and aid of his strike by urging other employees to strike, by giving publicity to the fact that he is on strike, by urging that support and patronage be withheld by the public generally from the employer against whom he is striking. In doing so, he may inflict great injury upon himself, his former employer and the public as well, but he is nevertheless acting within his rights when he does so. We do not hold or intend to decide anything which abridges these rights, but he must exercise them in a lawful manner. He may not employ force, violence, threats or intimidation, because in so doing he is interfering with the rights of others as sacred, and as much entitled to the protection of the law, as are his own rights.

We reaffirm and reiterate our holding that the right to strike is one of which the employee may not be deprived, and he may solicit support by any lawful means he chooses to employ, but in the recent case of *Smith and Brown* v. *State,* 207 Ark. 104, 179 S. W. 2d 185, we said: ''. . . but even picketing when accompanied by force, violence, intimidation or coercion cannot find any protec-

tion under the constitutional guaranties of freedom of speech and freedom of the press.''

Here there was actual violence. One man was knocked down, and there was the constant threat of the repetition of violence, at least the court might have so found. The size of the crowd interfering with persons who sought to enter did not diminish and we think the court was warranted in finding that these conditions not only had not improved, but were not likely to do so, and under these circumstances it was not error to make the temporary injunction permanent.

In the Chapter on Labor, 31 Am. Jur., § 249, p. 955, it is said: ''Permissible activities on the part of pickets do not include obstruction of access of customers. Pickets may not aggressively interfere with the right of peaceful ingress and egress to and from the employer's shop, or obstruct the public thoroughfares. Picketing is not peaceful where the sidewalk or entrance to a place of business is obstructed by pickets parading around in a circle or lying on the sidewalk.''

At § 242 of the same chapter it was said: ''Picketing a place having direct dealings with the public, such as a restaurant, has been condemned in some cases because of its tendency to deter prospective patrons of the business by intimidation from entering the place of business. Thus, it has been decided that employees of a restaurant keeper who are on a strike, have no right to congregate about the entrance of his place of business and there, either by persuasion, coercion, or force, prevent his patrons and the public at large from entering his place of business or dealing with him.''

At § 240 of the same chapter it is said: ''Force threatened is the equivalent of force exercised. In many cases, it has been observed, it is difficult to draw the line of demarcation between intimidation and inoffensive persuasion. But even when the acts of the strikers, although unaccompanied by violence or threats, are such an annoy-

ance to others as to amount to coercion or intimidation, they are unlawful.''

A large number of cases, many of them annotated, are cited in the notes to the text quoted, which fully sustain the text, and reference is made to them for the use of anyone who would pursue the subject further.

Reference is made in the brief of counsel for appellants to a motion in which the court was asked to dissolve the restraining order to permit peaceable picketing, but this motion was predicated upon the following allegation. ''Defendants (appellants) further state that the picketing and patrolling performed by them against the plaintiffs and the business of the plaintiffs was peaceable picketing within the laws of the State of Arkansas, and that no illegal act had been performed by them.'' The implication is inescapable from the allegations of this motion, that it was the intention to continue such picketing as had been practiced, and if so it was not error to have made the injunction permanent under the justifiable belief that future picketing would likely result in the continuance of intimidation and coercion previously employed.

In the case of *Milk Wagon Drivers Union* v. *Meadowmoor Dairies, Inc.,* 312 U. S. 287, 61 S. Ct. 552, 85 L. Ed. 836, 132 A. L. R. 1200, an opinion of the Supreme Court of Illinois upholding a permanent injunction was affirmed. It was there said: ''We cannot say that such a finding (that the picketing should be wholly enjoined) so contradicted experience as to warrant our rejection. Nor can we say that it was written into the Fourteenth Amendment that a state through its courts cannot base protection against future coercion on an inference of the continuing threat of past misconduct. Cf. *Ethyl Gasoline Corp.* v. *United States,* 309 U. S. 436, 60 S. Ct. 618, 84 L. Ed. 852.''

That case gives an interpretation of the effect of a permanent injunction in cases of this kind which we adopt as follows: ''The injunction which we sustain is 'permanent' only for the temporary period for which it may

last. It is justified only by the violence that induced it and only so long as it counteracts a continuing intimidation. Familiar equity procedure assures opportunity for modifying or vacating an injunction when its continuance is no longer warranted. Here again, the state courts have not the last say. They must act in subordination to the duty of this Court to enforce constitutional liberties even when denied through spurious findings of fact in a state court. Compare *Chambers* v. *Florida,* 309 U. S. 227, 60 S. Ct. 472, 84 L. Ed. 716. Since the union did not urge that the coercive effect had disappeared either before us or, apparently before the state court, that question is not now here."

The acts of violence and coercion in the instant case are not as great as those recited in the Drivers-Meadowmoor case, but they are of the same character, done and performed for the same coercive purposes and differ only in degree, and with such systematic persistence as to warrant the finding that they would have continued unless restrained.

The decree of the court making the injunction permanent as defined in the Meadowmoor case is affirmed.

Mr. Justice Robins and Mr. Justice Millwee dissent; Griffin Smith, Chief Justice, dissents from that part of the opinion which holds that the decree should not have been modified.

Robins, J. *(dissenting)*. In my opinion, the decree of the lower court should be so modified as to permit peaceful picketing by appellant union. The right of workers to organize, to strike, and to picket peacefully in order to obtain higher wages or better working conditions is basic and is protected by constitutional guarantees. The power of a state to forbid peaceful picketing was expressly denied by the Supreme Court of the United States in two comparatively recent cases. See *Carlson* v. *People of the State of California,* 310 U. S. 106, 84 L. Ed. 1104, 60 S. Ct. 746; and *Thornhill* v. *State of Alabama,* 310 U. S. 88, 84 L. Ed. 1093, 60 S. Ct. 736. In these cases our

highest court held that this right of peaceful picketing was protected by the federal constitution.

We recognized and sanctioned this right in our opinion in the case of *Riggs* v. *Tucker Duck & Rubber Company*, 196 Ark. 571, 119 S. W. 2d 507, where we said: "The right of laborers to organize for the purpose of collective bargaining, or to improve the conditions under which they work, is unquestioned; and so also is their right to go on strike if these demands are not met, and, as a means of enforcing their demands, they have the right, among others, to peaceably picket."

In that case this court refused to modify the injunction of the lower court against all picketing, but gave as a reason for doing so that the lower court was not requested to modify the injunction so as to prohibit only picketing conducted in an unlawful manner.

In the case at bar appellants did just what this court said was not done in the *Riggs* case, *supra*. The record shows that appellants filed in the lower court a motion asking for such a modification of the injunction as would permit peaceful picketing, and that the lower court denied this motion.

"In general, any injunction granted in an action involving a labor dispute should not be so broad as to include peaceful persuasion or peaceful picketing where such picketing is regarded as legal, unless such acts are being done in furtherance of a strike or combination for an unlawful purpose." 31 Am. Jur. 998.

While the evidence showed that one fist fight (in which neither participant was a member of appellant union) occurred, and that on several occasions opprobrious language was used during the picketing, no such state of continued violence as would show concert of unlawful action on the part of the strikers or as would negative the possibility of peaceful picketing was proved. While an injunction may properly be granted against picketing where wrongful acts on the part of the strikers are "not episodic and isolated but of the very texture and

process'' of the picketing *(Milk Wagon Drivers Union of Chicago* v. *Meadowmoor Dairies, Inc.,* 312 U. S. 287, 85 L. Ed. 836, 61 S. ·Ct. 552, 132 A. L. R. 1200), the right to picket should not be taken away from appellants because of isolated incidents—especially when it was not proved that the striking waitresses were in any respect responsible for the lone act of violence shown. *Cafeteria Union* v. *Angelos,* 320 U. S. 293, 64 S. ·Ct. ·126, 88 L. Ed. 58.

I am authorized to state that Mr. Justice MILLWEE concurs in the views above expressed.