## AMALGAMATED CLOTHING & Textile Workers Int'l Union *v.* EARLE INDUSTRIES, INC.

94-218 886 S.W.2d 594

Supreme Court of Arkansas
Opinion delivered November 7, 1994

*Trotter Law Firm, P.A.*, by: *Rick W. Skelton*, for appellant.

*Weintraub, Robinson, Weintraub, Stock & Bennett P.C.*, by:

*Jeff Weintraub* and *J. Gregory Grisham and Friday, Eldredge & Clark*, by: *James W. Moore*, for appellee.

JACK HOLT, JR., Chief Justice. This interlocutory appeal arises from a labor dispute involving appellant Amalgamated Clothing and Textile Workers International Union, an unincorporated association, and appellee Earle Industries, Inc., a corporation engaged in the manufacture of clothes hangers and garment bags.

Amalgamated raises two arguments on appeal, contending that the chancery court erred in denying (1) the union's motion to dismiss Earle Industries' complaint for failure to state facts upon which relief might be granted and (2) the union's alternative motion for summary judgment while granting Earle Industries' motion for a temporary restraining order. In support of these arguments, various sub-points have been presented, which focus on the conflicts in testimony concerning allegations of harm, the adequacy of other legal remedies, and the injuries to the union and the public interest.

It should be noted at the outset that Amalgamated's first point on appeal, relating to the denial of the motion to dismiss, cannot be considered by this court because it is couched in terms of an appeal of the denial of a motion to dismiss. The union's motion was based on Ark. R. Civ. P. 12(b)(6), which allows the defense of "failure to state facts upon which relief can be granted." However, Rule 12(b) also provides that:

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, *matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56*, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

(Emphasis added.) Perusal of the record reflects that matters presented to the court outside the pleadings consisted of videotapes of newscast coverage and security surveillance of the picketing on September 14, 1993, the texts of various appellate decisions, and the testimony of various witnesses.

■ Unquestionably, the motion to dismiss was effectively converted, under our rules of civil procedure, to one for summary judgment, and its denial is not subject to review on appeal. *Daniels* v. *Colonial Ins. Co.*, 314 Ark. 39, 857 S.W.2d 162 (1993). In his order granting a temporary restraining order, the chancellor specifically noted that "[a]t the hearings, both parties were given the opportunity to present evidence" and that the decisions to issue an order and to deny the motions to dismiss and for summary judgment were "[b]ased on the evidence adduced at the hearing, the arguments of counsel, and the record as a whole." In *Eldridge* v. *Board of Correction*, 298 Ark. 467, 768 S.W.2d 534 (1989), we reviewed a case involving a motion to dismiss as if it were an appeal following summary judgment where the chancellor had recited in his order that he had considered the "motions, the responses thereto, as well as the pleadings, briefs, exhibits attached thereto, and other matters."

■ Similarly, the portion of the second point on appeal relating to the chancellor's denial of the union's motion for summary judgment must also be disregarded. As we have repeatedly held, the denial of a motion for summary judgment is neither reviewable nor appealable. *Daniels* v. *Colonial Ins. Co.*, 314 Ark. 49, 857 S.W.2d 162. What remains for us to consider, then, is a single issue: Amalgamated's appeal from the chancery court's granting of Earle Industries' motion for a temporary restraining order. Another item, however, should be briefly addressed before we proceed to the merits of this issue.

■ The union contends, in its reply brief, that Earle Industries' brief should be stricken for failure to comply with the requirement of Ark. Sup. Ct. R. 4-4(b). That rule states that "[b]riefs tendered to the Clerk will not be filed unless evidence of service upon opposing counsel and the trial court has been furnished to the Clerk." The certificate of service contained in Earle Industries' brief does not recite that a copy was sent to the trial court. No penalty is provided in the rules of the court for such an oversight, and the Clerk appeared to have been satisfied with the status of the brief when it was submitted. Thus, we see no prejudice in the Clerk permitting Earle Industries' brief to be filed.

*Facts*

On September 14, 1993, members and supporters of Amal-

gamated gathered at the high school in Earle, Arkansas, for a rally. The Reverend Jesse Jackson delivered a speech, after which approximately sixty to seventy-five persons,[1] carrying banners, marched down U.S. Highway 64 to Earle Industries' factory.

Law enforcement officials accompanied the group to ensure traffic control. When the marchers arrived at the manufacturing plant, they congregated at the main entrance, and the Reverend Jackson spoke with the personnel manager, Gary Smith, asking to see Peter Felsenthal, Earle Industries' senior vice president. Meanwhile, Melvin Luebke, a union activist, was arrested by the Earle Police Department on charges of criminal mischief and criminal trespass after he cut the lock and chain on the factory's back gate.

The demonstrators remained in front of the plant's main entrance during the employee lunch period for about forty or forty-five minutes, picketing, singing, chanting, and listening to a speech by the Reverend Jackson. Plant employees taking their lunch breaks were allowed to join the union supporters. The front gate was closed for the duration of the protest, and traffic was impeded on U. S. Highway 64. About fifty protesters sat down in the middle of the highway, and a number of them parked their vehicles on the side of the highway. All but one of the demonstrators, Steve Klawan, who was arrested, eventually moved out of the highway. Some vehicles remained on the roadside and they were towed. Two more union supporters, Kathleen Lee and Edna Mae Byars, were arrested for obstructing traffic by parking their cars on the highway, bringing to a total of four the number of protesters who were taken into custody. All four pled guilty and were released after a union representative paid their fines. Less than an hour after the protesters arrived, they dispersed.

On September 21, 1993, Earle Industries filed a complaint for injunctive relief against the union in the Chancery Court of Crittenden County, alleging that the "mass picketing" that occurred the previous week and the "threat of additional mass picketing" posed an "imminent threat of danger to the public safety and to the Plaintiff's business interests and employees, as well as a

---

[1] Another estimate placed the number of demonstrators between seventy and seventy-five, while one media source reported about two hundred.

threat to Plaintiff's property interests. . . ." Continued mass picketing, the complaint alleged, would result in "irreparable harm" to Earle Industries and its employees and would imperil the public safety "since the marching and parading of a large number of people would again block ingress and egress to the main employee entrance to Plaintiff's Plant and block Highway 64[,] which is a major public thoroughfare."

Asserting the lack of an adequate remedy at law, Earle Industries requested a temporary restraining order:

> to restrain the Defendants, and those acting by, through, and in concert with them, from using or employing mass pickets in the act of picketing on Highway 64 or within a 50-foot radius of the fence surrounding Plaintiff's Plant; congregating, patrolling, walking, or sitting in parked cars within 50 feet of the fenced area immediately surrounding Plaintiff's Plant in Earle, Crittend[e]n County, Arkansas[,] or to interfere in any ma[nn]er, with the peaceful ingress and egress to and from Plaintiff's Plant or Highway 64 surrounding Plaintiff's Plant in Earle, Crittend[e]n County, Arkansas. Plaintiff also requests that this court enjoin Defendants and those acting on their behalf from employing more than three pickets in the area described herein. Plaintiff also requests that this court issue a Preliminary Injunction, and, following a trial in this matter, a permanent injunction.

A hearing was held on September 22, 1993, and testimony was delivered, and exhibits, including videotapes of both area news coverage and factory security surveillance of the incident, were received by the chancellor. Another hearing was held on September 29, 1993, and additional evidence was presented.

Prior to the beginning of the second hearing, Earle Industries filed a brief in support of its motions for a temporary restraining order and preliminary injunction. Simultaneously, Amalgamated filed a motion to dismiss and an alternative motion for summary judgment, asserting the allegations in the complaint were unsupported by "specific factual statements" and that adequate legal remedies were available for any future harm.

Following the September 29, 1993 hearing, the chancellor

took the matter under advisement. On November 18, 1993, the chancery court issued an order granting to Earle Industries a temporary restraining order and denying the union's motions to dismiss and for summary judgment. The order stated, in part:

> The Court finds that Defendants' action in (1) cutting the lock and chain on Plaintiff's gate; (2) blocking traffic on that portion of Highway 64 in front of Plaintiff's business; and (3) blocking Plaintiff's right of ingress and egress to one of its drives, are actions that should be restrained and enjoined.

* * *

> IT IS . . . HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant ACTWU, Southwest Regional Joint Board, Local 828, their officials, and others cooperating with them are RESTRAINED AND ENJOINED from:
>
> (1) blocking or obstructing, or attempting to obstruct, the free use of the streets and highways adjacent to Plaintiff Earle Industries' place of business, as well as passageways into and out of said business;
>
> (2) going on Plaintiff's place of business, unless invited by Plaintiff, and
>
> (3) cutting or damaging Plaintiff's property.

The union then filed this interlocutory appeal.

### Temporary restraining order

As noted earlier, Amalgamated's first point for reversal amounts to an appeal from a denial of a motion for summary judgment and is not subject to review on appeal. Moreover, as indicated above, part of the union's second point for reversal is framed in terms of an appeal from the chancellor's denial of the defense motion for summary judgment in its favor and is not appealable. *See Daniels* v. *Colonial Ins. Co.*, 314 Ark. 49, 857 S.W.2d 162.

In the remaining portion of its second point on appeal, the union urges that the chancery court erred in granting Earle Industries' motion for a temporary restraining order, the sole issue we may consider and to which we now turn.

In granting or refusing interlocutory injunctions, the trial court shall set forth the findings of fact and conclusions of law which constitute the grounds of its action and those findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard will be given the opportunity of the trial court to judge the credibility of the witness. Ark. R. Civ. P. Rule 52(a). Here, the chancellor's findings were brief, but he was not asked to make further findings regarding irreparable harm. In any event, requests for findings are unnecessary for purposes of review. Ark. R. Civ. P. Rule 52(a). In reviewing the record before us, we hold the evidence is more than sufficient to show that Earle Industries had sustained irreparable harm at least to the extent the chancellor fashioned and tailored the narrow relief granted.

The applicable law in these matters is well settled. Arkansas courts have granted injunctive relief in situations where mass picketing, blocking, and intimidation are employed during a labor dispute. *Smith* v. *F & C Engineering Co.*, 225 Ark. 688, 285 S.W.2d 100 (1955); *Local Union No. 858* v. *Jiannas*, 211 Ark. 352, 200 S.W.2d 763 (1947). *Smith* v. *F & C Engineering, supra*, involved a labor dispute between a local labor union and an engineering company which refused to pay overtime. The union established a picket line at one of the engineering company's plants. The trial court issued an injunction restraining union members from picketing the company's places of business and from threatening or committing acts of intimidation or violence against the company's business, employees, and customers. In granting the injunction, this court observed that:

> It is well settled by the decisions of the U. S. Supreme Court and our own cases that peaceful picketing is allowed under the constitutional guaranty of freedom of speech in order that a union may acquaint the public with the fact and nature of a labor dispute and solicit public support in any lawful manner to prevail in the controversy. *Thornhill* v. *Alabama*, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093; *Local Union No. 313* v. *Stathakis*, 135 Ark. 36, 205 S.W. 450, 6 A.L.R. 894. It is equally settled that the law does not countenance the use of threats, intimidation, force, coercion, violence *or other unlawful means, however laudable the motive or purpose of the strikers. Riggs* v. *Tucker Duck &*

*Rubber Company*, 196 Ark. 571, 119 S.W.2d 507; 31 Am. Jur., Labor, § 240. In this connection the U.S. Supreme Court has held the state still may exercise "its historic powers over such traditionally local matters as public safety and order and the use of the streets and highways." *Allen-Bradley Local, W.E.R.M.W.* v. *Wisconsin Employment Relations Board*, 315 U.S. 740, 62 S.Ct. 820, 86 L. Ed. 1154.

225 Ark. at 697, 285 S.W.2d at 105. (Emphasis added.)

In *Jiannas*, a local union was enjoined from the illegal picketing of a restaurant in Pine Bluff. In affirming the trial court, we quoted the following rules with approval:

> "*Permissible activities on the part of pickets do not include obstruction of access of customers. Pickets may not* aggressively interfere with the right of peaceful ingress and egress to and from the employer's shop, or *obstruct the public thoroughfares. Picketing is not peaceful where the sidewalk or entrance to a place of business is obstructed by pickets parading around in a circle or lying on the sidewalk.*"

> \* \* \*

> "Picketing a place having direct dealings with the public, such as a restaurant, has been condemned in some cases because of its tendency to deter prospective patrons of the business by intimidation from entering the place of business. Thus, it has been decided that *employees of a restaurant keeper who are on a strike, have no right to congregate about the entrance of his place of business and there, either by persuasion, coercion, or force, prevent his patrons and the public at large from entering his place of business or dealing with him.*"

> \* \* \*

> "*Force threatened is the equivalent of force exercised. In many cases, it has been observed, it is difficult to draw the line of demarcation between intimidation and inoffensive persuasion. But even when the acts of the strikers, although unaccompanied by violence or threats, are such an annoy-*

*ance to others as to amount to coercion or intimation, they are unlawful."*

211 Ark. at 358-9, 200 S.W.2d at 766. (Emphasis added.)

We first point out that, while unlawful activities occurred in the case here, it can be said that the facts here existent do not quite reach the level of concern exhibited in either *Smith* or *Jiannas*. In *Jiannas*, union pickets and their sympathizers milled in the entrance way to a Pine Bluff restaurant, urged customers and employees not to enter. They cursed, bumped, and threatened people who did, or attempted to, enter, and one such man was beaten and severely injured. In *Smith*, evidence showed cars were parked up and down the road running by the company's plant, and on one occasion, a truck was used to block the road. Employees were cursed, threatened, and frightened and the company's general foreman was attacked by a union member. Evidence further revealed that nails had been placed in entrance and exit ways to and from the plant, causing numerous flats on company vehicles.

In the present case, a continuing strike was not involved. Even so, the proof showed that, in an earlier labor dispute and demonstration in October 1991, the Reverend Jackson led a similar march against Earle Industries, and he vowed to return. He kept that vow on September 14, 1993, and at the demonstration's end, the Reverend Jackson again pledged to return a third time. Trespasser convictions resulted from both demonstrations. However, the 1993 demonstration posed more problems than those that arose in 1991. In fact, those problems in 1993 involved not only Earle Industries and its business and employees, but also the local law enforcement's ability to control the demonstration.

The Chief of Police of Earle, Gregory Martin, offered the strongest testimony in support of Earle Industries' request for an injunction. Chief Martin was the officer who observed a union member cutting the lock off the back gate of Earle Industries. He stated that the union demonstrators, numbering approximately sixty to seventy-five people, were heading toward the back gate when the man cut the lock. Chief Martin immediately arrested the man, and his officers then formed a line to stop the crowd from marching toward the gate. According to Chief Martin's testimony, the demonstrators blocked Highway 64 and the entrance

to Earle Industries' factory. Ten to fifteen demonstrators' vehicles blocked the east and westbound lanes of Highway 64. Chief Martin stated that several demonstrators refused to move their cars and that those cars were towed. About fifty people were sitting in the middle of Highway 64 when the officers arrived at the scene. Eventually, all of the protestors moved from the highway, but one individual had to be physically removed by Chief Martin. Demonstrators used banners to block Highway 64 and the factory's entrance, and, while officers made arrests, the crowd chanted, "We shall not be moved." Chief Martin stated that he employed all five officers of the Earle Police Department to control the demonstration and called for other backup because he was concerned that "things would get out of hand." He added that, because of the demonstration, he had no officers available to respond to calls from other parts of town.

Employees of Earle Industries also testified that they were frightened and intimidated by the large group of protestors. Moreover, employees were distracted from their work because of the demonstration. Earle Industries enhanced security measures, using supervisors to monitor the situation. Pamphlets were distributed, claiming, "We Will Not Stop Until We Get Justice" and "The only thing Felsenthal understands is brute force."

Amalgamated counters with evidence and testimony that it claims mitigates or conflicts with that presented by Earle Industries. While it is true that conflicting evidence was presented, it is sufficient to say that the chancellor was in a more favorable position than this court to judge credibility. After careful consideration of all the evidence, we hold that the chancellor's decision was not clearly erroneous or clearly against the preponderance of the evidence and that, under the circumstances, he did not abuse his discretion in issuing the temporary injunction. *See Smith* v. *F & C Engineering, supra*; Ark. R. Civ. P. Rule 52(a).[2]

---

[2]We note that Amalgamated cites *Paccar Fin. Corp.* v. *Hummell*, 270 Ark. App. 876, 606 S.W.2d 384 (1980), for the proposition that the plaintiff's allegations of irreparable harm must stand unrebutted or must show that it will suffer irreparable harm absent an injunction. While this rule is correct as stated in *Hummell*, the rule does not mean that the mere offering of rebuttal evidence negates issuance of an injunction. In any event, we are holding that the chancellor did not err in deciding that Earle Industries would suffer irreparable harm in the absence of an injunction.

Amalgamated presents an alternative argument that would require the trial court to balance the threat of irreparable harm to Earle Industries against the harm and injury the requested relief would inflict upon Amalgamated and to consider the effect that the injunctive relief would have upon the public. *Roberts* v. *Van Buren Public Schools*, 731 F.2d 523 (8th Cir. 1984).

■ Regarding a worker's right to strike, this court in *Local Union No. 858* v. *Jiannas, supra,* stated the following:

> We do not hold or intend to decide anything which abridges these rights, but he must exercise them in a lawful manner. He may not employ force, violence, threats or intimidation, because in so doing he is interfering with the rights of others as sacred, and as much entitled to the protection of the law, as are his own rights.

211 Ark. at 357, 200 S.W.2d at 766.

■ Earle Industries has shown irreparable harm inflicted upon it as well as the threat of such harm in the future. The chancellor, however, issued no blanket injunction prohibiting Amalgamated from picketing or demonstrating. Nor would this court countenance such an injunction under the circumstances of this case. In balancing the harm to Amalgamated or the public against the irreparable harm to Earle Industries, the chancellor merely enjoined Amalgamated from engaging in the illegal activities shown to have occurred in 1991 and 1993. He did not, it must be emphasized, enjoin the union from conducting demonstrations. In other words, the chancellor only restrained union members from (1) blocking or obstructing, or attempting to obstruct, the free use of the streets and highways adjacent to Earle Industries' place of business, as well as passageways into and out of said business; (2) going on Earle Industries' place of business, unless invited; and (3) cutting or damaging Earle Industries' property.

Although we affirm the chancellor's granting of a temporary restraining order, Amalgamated is not without relief. If and when Amalgamated shows the chancery court that peaceful picketing and demonstrating can be carried on in a manner that will avoid the likelihood of a repetition of the unlawful activities found by the trial court as described in its order, it may do so. Upon mak-

ing such a showing, it may seek modification of the court's order. *Smith* v. *F & C Engineering, supra.*

Affirmed.

DUDLEY, NEWBERN, and BROWN, JJ., dissent.

ROBERT H. DUDLEY, Justice, dissenting. Amalgamated Clothing and Textile Workers International Union raises three points of appeal. The first two can be summarily dismissed. The first point is that the complaint of Earle Industries, Inc. did not state a cause of action. The second is that Amalgamated was entitled to summary judgment. Both arguments are bypassed since the motion for a temporary restraining order was heard on its merits. The only real issue is whether a court of equity should have assumed jurisdiction to enjoin the commission of criminal offenses. The majority opinion holds that the chancery court properly assumed jurisdiction. I respectfully dissent.

## I.

The undisputed facts are as follows. In October 1991, Reverend Jesse Jackson visited the plant of Earle Industries in support of Amalgamated's efforts at negotiation and spoke from the back of a truck parked in the Earle Industries' employee parking lot. Earle Industries objected to the presence of Reverend Jackson and the Amalgamated supporters. Two Amalgamated supporters were arrested and charged with trespassing. Significantly, both trespass charges were dismissed at the request of Earle Industries.

Almost two years later, on September 14, 1993, Amalgamated and its supporters, again including Reverend Jackson, held another rally in the City of Earle. The rally began with a speech by Reverend Jackson at Earle High School. After the speech, local law enforcement officers escorted Reverend Jackson and sixty to seventy-five Amalgamated supporters the short distance down State Highway 64 to the plant of Earle Industries. The main entrance to the plant is from Highway 64.

The management of Earle Industries, knowing that the Amalgamated supporters were coming to the plant, placed new chains on all gates and closed the main gates. The Amalgamated group reached the plant's main gates just as the employees' lunch break

began. During the forty-five-minute lunch break the supporters remained in front of the closed main gates. They sang, chanted, and listened to another speech by Reverend Jackson. Two supporters were given police citations for obstructing traffic because their parked cars partially blocked Highway 64. Another supporter, who sat in the highway and had to be physically removed by the officers, was given a citation. A fourth Amalgamated supporter was cited by police for criminal mischief and criminal trespass after he cut the lock and chain on the plant's back gate. All four later pleaded guilty to the criminal charges. During the rally a flyer was distributed. It was captioned, "We Will Not Stop Until We Get Justice." The body of the flyer contained the sentence, "The only thing that Felsenthal [management] understands is brute force."

## II.

Arkansas remains one of the few states that still maintains separate courts of law and equity. Mark R. Killenbeck, *Nothing That We Can Do? Or, Much Ado About Nothing? Some Thoughts on Bates v. Bates, Equity, and Domestic Abuse in Arkansas*, 43 Ark. L. Rev. 725 (1990); *see* Ark. Const. art 4. Under our separate court system, unless a cause of action is confided by the constitution exclusively to another court, it belongs exclusively, or concurrently, to the circuit court. *State* v. *Devers*, 34 Ark. 188, 198 (1879). The separation required by the Arkanas Constitution in cases such as the present was set out in *Meyer* v. *Seifert*, 216 Ark. 293, 225 S.W.2d 4 (1949), as follows:

> That equity will not act to restrain ordinary violations of the criminal law, but will leave the task of enforcing the criminal laws to courts having criminal jurisdiction, is basic learning in our legal system. But it is equally basic that if grounds for equity jurisdiction exist in a given case, the fact that the act to be enjoined is incidentally violative of a criminal enactment will not preclude equity's action to enjoin it.

*Id.* at 298, 225 S.W.2d at 7.

The sequence of conditions which are necessary before equity will enjoin a crime were set out in *Webber* v. *Gray*, 228 Ark. 289, 295, 307 S.W.2d 80, 84 (1957), as follows:

> In general, these conditions are, that unless relief is granted a substantial right of the plaintiff will be impaired to a material degree; that the remedy at law is inadequate; and that injunctive relief can be applied with practical success and without imposing an impossible burden on the court or bringing its processes into disrepute.

Each of the three conditions must be met before equity will exercise jurisdiction and enjoin the commission of a criminal offense.

## A.

The first condition is that the party seeking the equitable remedy will suffer the loss of a *substantial right to a material degree* if equity does not intervene. This substantial right must be weighed against any harm the injunction might cause. *Smith v. Hamm*, 207 Ark. 507, 181 S.W.2d 475 (1944).

## 1.

The direct losses of a substantial right suffered by Earle Industries in the past are losses occasioned by three misdemeanor trespass offenses and one criminal mischief offense. Earle Industries asked that two of the misdemeanor charges be dismissed, and they were dismissed. Consequently, it is hard to rationalize those trespasses now being of significance and, under these circumstances, cannot be said to be a loss to a "material degree." The only other direct loss of a right was caused by the offender who cut the chain and was arrested for trespass and criminal mischief. Trespass and criminal mischief cannot be condoned, and Earle Industries did suffer the loss of a chain when the chain that locked the gate was cut. Earle Industries must have also suffered some worry about its security as a result of the criminal mischief. The offender who cut the chain pleaded guilty and was fined. There is no direct or circumstantial proof that the offender might again cut a chain locking a gate or again commit criminal mischief. The other three losses of rights were indirect, as they concerned illegal parking and sitting in Highway 64. These three offenses would be more correctly described as adversely affecting the rights of the public.

## 2.

The losses suffered by Earle Industries must be weighed against any harm that might be caused by a court of equity assuming jurisdiction and granting relief. Four potential harms are always present when a case involves an injunction against criminal offenses. First, there is a potential harm in the possible conflict with the constitutional guarantee of the right to trial by jury. Equity does not afford a jury trial, and the absence of that protection is a substantial factor to be weighed against chancery assuming jurisdiction. *Smith*, 207 Ark. at 512, 181 S.W.2d at 478; *see also* Robert A. Leflar, *Equitable Prevention of Public Wrongs*, 14 Tex. L. Rev. 427, 429-33 (1936). Second, the proof necessary for a conviction in a criminal court is constitutionally designed to require a high standard of proof, proof beyond a reasonable doubt. The proof necessary to sustain a civil action for contempt is lesser, a preponderance of the evidence. Third, a court of equity can issue a show cause order, and the person cited must show why he should not be held in contempt. In a criminal proceeding the accused cannot be compelled to give evidence against himself. As a result, when a court of equity enjoins the commission of a crime, the person enjoined might be cited for contempt in a court of equity and stands to lose these three constitutional guarantees. Fourth, the person enjoined will suffer some stigma or embarrassment comparable to that suffered by being labeled a habitual offender because, before a court of equity assumes jurisdiction, there must be proof that the person enjoined committed acts of violence with such systematic persistence as to warrant a finding that they would be continued unless restrained. *Local Union No. 858 Hotel & Restaurant Employees Int'l Alliance v. Jiannas*, 211 Ark. 352, 200 S.W.2d 763 (1947).

The majority opinion intimates that a flyer entitled, "We Will Not Stop Until We Get Justice," shows, in part, that a court of equity should assume jurisdiction. Before exercising jurisdiction in this type of case, a court of equity must always be aware that the right of free expression through speech and peaceful picketing is not to be endangered by the use of injunctions.

In summary, it is doubtful that Earle Industries would have suffered the loss of a *substantial right* to a *material degree* if equity had refused to exercise jurisdiction. It is even more doubt-

ful when the "right" is weighed against the potential harms of equity exercising jurisdiction in this particular case.

### B.

The second condition to be shown before equity exercises jurisdiction is that the remedy at law is inadequate. Except in narrow circumstances, equity will not enjoin the commission of a crime because the remedy at law is adequate, and criminal jurisdiction is in circuit court. The limited exception, articulated in *Smith* v. *Hamm*, 207 Ark. 507, 181 S.W.2d 475 (1944), arises when the criminal act is only "incidental" and there is a danger of "irreparable pecuniary injury to property or pecuniary rights of the complaining party." *Id.* at 512, 181 S.W.2d at 478. In *McGehee* v. *Mid South Gas Co.*, 235 Ark. 50, 55, 357 S.W.2d 282, 286 (1962), we slightly modified the *Smith* v. *Hamm* standard and said, "[T]he mere existence of a remedy at law does not deprive equity of such jurisdiction unless such remedy is 'clear, adequate and complete.'" The exception giving equity jurisdiction thus turns on the "adequacy" of the criminal remedy. In this vein, the court of appeals wrote that "the Arkansas Criminal Code contains numerous provisions which punish this type conduct, and these matters may be laid to rest between the parties by their initiating appropriate criminal proceedings." *Maxwell* v. *Sutton*, 2 Ark. App. 359, 363, 621 S.W.2d 239, 241 (1981). The limitations of this exception were recently affirmed in *Bates* v. *Bates*, 303 Ark. 89, 793 S.W.2d 788 (1990).

The majority opinion implies that equity can exercise jurisdiction in part because the Amalgamated supporters gathering outside the front gate prevented employees from leaving and entering the front gate. However, the criminal law provides that it is a felony to prevent employees from engaging in any lawful vocation. Ark. Code Ann. § 11-3-401 (1987). The majority opinion provides that equity can exercise jurisdiction in part because of obstruction of the highway. Yet obstructing a highway is a criminal offense. Ark. Code Ann. § 5-71-214 (Repl. 1993). The majority opinion states that Amalgamated supporters might trespass on Earle Industries' property in the future. Yet those who might trespass on Earle Industries' property can be charged with criminal trespass or criminal mischief. Ark. Code Ann. §§ 5-38-203 & 5-39-203 (Repl. 1993). The very fact of the four arrests,

coupled with the fact that the violations stopped thereafter, shows that the remedy at law is "clear, adequate and complete."

When an act constitutes a criminal offense, there must be repeated and systematic violations of the criminal law before the remedy will be deemed "inadequate" and equity will intervene. The three cases involving labor union activities in Arkansas which are cited in the majority opinion clearly illustrate this requirement. In *Smith* v. *F&C Engineering Co.*, 225 Ark 688, 285 S.W.2d 100 (1955), the first of the three cases cited in the majority opinion, employees of F&C Engineering were repeatedly cursed and threatened with physical violence by union sympathizers. Bands of union sympathizers roamed near the place of employment and at times blocked the entrance. Employees were in real fear for their safety. On one occasion an employee had to seek a police escort to his home. Another quit his job rather than continue under the circumstances. A foreman was attacked with a blackjack. The same foreman's pickup truck was tampered with to the extent that it would not run. Employees who crossed the picket line were told that the same thing would happen to them. A rock was hurled into an employee's car. Oil and water were drained from a motorized machine. Each morning nails were strewn along the roads used by F&C Engineering and its employees, and they were plagued with numerous flats on company vehicles. Other threats were made over a considerable period of time. In upholding the grant of an injunction we observed:

> In *Local Union No. 858 Hotel and Restaurant Employees Int'l Alliance* v. *Jiannas*, 211 Ark. 352, 200 S.W.2d 763, we held that acts of violence and coercion were committed with such systematic persistence as to warrant a finding that they would be continued unless restrained where pickets walked very close to the door and on several occasions had to be pushed aside by customers to gain entrance to the restaurant being picketed, and on one occasion a customer was knocked down with a pair of brass knucks and severely injured.

*Id.* at 698, 285 S.W.2d at 106.

It is noteworthy that the above-cited case of *Jiannas* is the second labor dispute case cited in the majority opinion. Yet it

shows that the violence and coercion must have been pursued with a "systematic persistence" before the remedy at law will be deemed inadequate. In that case the union went on strike against a restaurant that had one front entrance, a five-foot-wide door. Picketers walked back and forth in front of the one entrance. While there were usually only two picketers, the union sympathizers often numbered from ten to thirty, and they milled around the building. Customers were brushed by picketers or supporters. One customer had to push his way into the restaurant; he was later knocked down with a pair of brass knuckles and severely injured. Other customers were told not to enter the business. They were told they would have trouble if they entered. Many customers were stopped. One lady testified that as she entered someone said, "Nobody but whores would go into that cafe." On another occasion, as customers entered, someone shouted, "There go some sons of bitches now." Both the owners and employees were frightened. The violence and threats of violence continued over a considerable period of time. While these threats of violence and actual violence continued, the restaurant's business dropped by 90%.

The third case involving a labor dispute in Arkansas that is cited in the majority opinion also stands for the rule that a criminal statute will not be deemed inadequate until there have been repeated and continuous violations of the statute. In that case, *Harrison* v. *Terry Dairy Products, Inc.*, 225 Ark. 953, 287 S.W.2d 473 (1956), the chancellor entered an order enjoining acts of intimidation and violence because the union had threatened physical harm to the company's employees, used force to prevent the employees from entering their place of employment, used "goon squads" to follow employees and threaten and intimidate those employees until they quit work, beat and battered employees, and damaged the dairy's plant. After the temporary injunction was entered, heavy charges of dynamite were planted in the milk bottling room and in each of the boilers of the dairy's plant, and each was set off. An additional twenty-one sticks of dynamite were also found inside the plant and foreign substances were found in the gasoline tanks of the dairy's trucks.

In contrast to the facts of those three cases are the facts of the case at bar. The majority opinion relies heavily on the testimony of the Earle Chief of Police, Gregory Martin. His cross-examination is abstracted, in part, as follows:

There were about fifty people sitting in the highway when we arrived, but we had to physically remove only one. Other than the one person I arrested for cutting the lock, I can't say that any other person got on the company's property. He is the only person we had to physically remove from the company's property. The protestors came to the plant behind my police car, and we did not ask them to leave the area, because we were under the impression that they were going to stand right in front of the factory. We did ask them to move back off the property once they started moving towards the gate.

We escorted the crowd right up to the front gate. We did not ask them to completely leave the scene. We just tried to make sure they did not get on the company property, and we physical[ly] removed one man from the highway after asking him to move. When I first arrived at the front gate, there were no people sitting in the road. Ten to fifteen minutes later, people started sitting in the highway. At first, I was standing down by the front gate, then I saw the people in the road. I told everyone sitting in the highway they would have to move at that time. They were chanting "we shall not be moved." After we asked them several times, everyone moved but the one person.

I didn't hear any of the protestors make any threats of bodily harm to any other person. I didn't see any of the protestors inflict any bodily harm on any other person. I am aware of no damage to the property, other than the lock being cut. I didn't hear any threats of property damage being made by any of the protestors.

The two people arrested during the incident of October, 1991 were charged, but the charges were dropped because the staff at Earle Industries decided not to proceed with the charges. Of the four people arrested on September 14, 1993, one was arrested with respect to cutting the lock, one was arrested after he was removed from the highway, the other two were arrested for illegal parking when they came to claim their vehicles.

The facts of the case at bar do not rise to the same level of

repeated harassing conduct as the facts of the cases cited by the majority. The remedy at law thus has not been shown to be "inadequate," as that word is used in our cases, and, as a result, the court of equity erred in exercising jurisdiction to enjoin the commission of a criminal offense.

## C.

The third condition is that injunctive relief can be applied with practical success and without imposing an impossible burden on the court or bringing its processes into disrepute. The initial part of this condition is that the relief can be applied with practical success. Here, the chancellor issued a temporary restraining order against Amalgamated that, in the language of the majority opinion, provides that "the union is simply enjoined from (1) blocking or obstructing, or attempting to obstruct, the use of adjacent highways and streets and business passageways; (2) going uninvited onto business property; and (3) cutting or damaging business property." Thus, the temporary restraining order provides relief that is no different than that afforded by the criminal laws. The only difference is that it would be enforced with contempt powers. Thus, it does not seem that the court of equity has any more chance of success, as a practical matter, than the criminal courts.

## III.

The basic issue in this case is the separation of the courts of law and equity mandated by the Constitution of Arkansas. We should follow the mandate of the Constitution. Equity should not enjoin the future commission of criminal acts in this case.

NEWBERN, J., joins in this dissent.

ROBERT L. BROWN, Justice, dissenting. I disagree with the majority's conclusion that Earle Industries has shown that irreparable harm was inflicted upon it.

Our law is clear that a temporary restraining order will not issue unless a party seeking the order demonstrates to the court that there is a likelihood that irreparable harm will result without the temporary order. *See Smith* v. *American Trucking Ass'n*, 300 Ark. 594, 781 S.W.2d 3 (1989); *Kreutzer* v. *Clark*, 271 Ark. 243, 607 S.W.2d 670 (1980); *Paccar Financial Corp.* v. *Hum-*

*mell*, 270 Ark. 876, 606 S.W.2d 384 (Ark. App. 1980). Moreover, a temporary restraining order is an extraordinary remedy to be invoked only where the complainant's right is clear, and there is no other adequate remedy. I *Joyce on Injunctions*, § 9, p. 18 (Matthew Bender & Co. 1909). Harm is only considered to be irreparable "when it cannot be adequately compensated by money damages or redressed in a court of law." *Kreutzer*, 271 Ark. at 244, 607 S.W.2d at 671.

That *irreparable harm* was likely to afflict Earle Industries because of the 45-minute demonstration during the lunch hour on September 14, 1993, is not borne out by the record. I have no doubt that the demonstration caused the managers and some employees of Earle Industries inconvenience, frustration, and even consternation. There was some criminal activity (three persons were arrested for trespassing and a fourth for cutting a lock off a back gate) and the business operation was disrupted that day because of the activity. But the test for a temporary restraining order, as stated above, is irreparable harm that cannot be repaired or remedied by money damages or by our criminal laws. Under that test, I glean no proof of irreparable harm resulting from the demonstration or proof that irreparable harm was likely to occur in the future in the absence of a temporary order.

The basis for the TRO was the Reverend Jesse Jackson's two demonstrations at Earle Industries over a two year period: one in October 1991 and the demonstration in question on September 14, 1993. Earle Industries also pointed to the four arrests, the all-but-total blocking of its main entrance by the demonstrators for 45 minutes, and the partial impediment to traffic on U.S. Highway 64 caused by the marchers. The potential for future demonstrations was evidenced, according to Earle Industries, by a leaflet distributed after the demonstration which stated that Reverend Jackson "declared that he will return and fight for the workers until there is a contract." The leaflet also stated: "The only thing that Felsenthal [Earle Industries' senior vice president] understands is brute force." A union member in addition, told a television reporter that the law had failed another union member, and they were taking the law into their hands.

Despite the leaflet and the union member's statement, a reading of the record makes it clear that local law enforcement

agencies had this relatively brief demonstration well under control from the outset. Arrests were made and disturbances were contained. One man was dragged from U.S. Highway 64 by the Chief of Police of the Earle Police Department. Otherwise, there was no proof of physical confrontation. In short, public safety was not jeopardized. Enforcement of existing criminal statutes was sufficient to quell any disturbance. Speeches were made, and the demonstration was short lived.

This activity by the union was undoubtedly orchestrated as a media event. Admittedly, disruption to the business operations of Earle Industries did occur, but not irreparable harm, present or future. More dire circumstances must be shown to justify such a finding. A 45-minute rally during the lunch hour, even with all the attendant circumstances, simply does not qualify. Because only a modicum of evidence of likely irreparable harm to Earle Industries in the future exists and because the order addresses activities which are readily remedied under existing criminal law, there is no basis for invoking this extraordinary remedy. Furthermore, to issue a temporary injunction under these facts could well have the effect of thwarting peaceful demonstrations in the future. I would reverse the chancellor's decision and void the order.

NEWBERN, J., joins.